**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| JOHN AND KIMBERLY BEAHN, individually and as parents and next friends of P.B., M.B., AND B.B., MINORS, and on behalf of all others similarly situated, *et al.*<br><br>PLAINTIFFS,<br><br>v.<br><br>TRAVIS A. GAYLES, *et al.*<br><br>DEFENDANTS. | Case No.: _____ |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF TEMPORARY,**
**PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF**

On Friday evening, after business hours, and without warning, the Montgomery County Health Officer abruptly announced that all private and religious schools in Montgomery County are "prohibited from physically re-opening for in-person instruction through October 1, 2020." This blanket order, directed only at religious and private schools, purports to effectively prevent more than 23,000 Montgomery County students from returning to school in the coming weeks.

The surprise order was stunning in its abruptness and timing. It was issued on the eve of school reopening, without notice to parents, students, or schools. Families had paid tuition and made firm enrollment decisions. Most schools had spent months researching, planning and installing expensive retrofitting of their schools, following CDC and State guidelines for reopening. Since the pandemic broke in March, neither State nor County government has found it necessary to issue *any* order directed at religious or private schools prior to this one. And the order was not in response to any COVID-19 outbreak. In fact, there has not been a single

reported COVID-19 cases in any Montgomery County religious or private school during the pandemic.

This order is the only one of its kind in the State of Maryland or, apparently, the entire country. It applies only to religious and other private schools. Although Montgomery County Public Schools abruptly abandoned their detailed plan for classroom learning, public schools continue to have discretion as to when to open and close. No other facilities or businesses have been prevented from operating in-person. Bars, restaurants, gyms, bowling alleys are all now operating. Nail salons are open. Some of the colleges have chosen to open. Day care centers are open. Technical schools are open. In the very same week that the County announced closing religious and private schools, they also announced the re-opening of in-person classes and camps sponsored by the Montgomery County Department of Parks.

The County Health Officer's order purports to be acting on the authority of the Governor's executive order and Maryland State Health Department, but neither provides such authority. Under the state's emergency laws, authority to take executive action in the pandemic is vested exclusively in the governor. On Saturday, within 18 hours of the County Health Officer's decree, Governor Hogan flatly denounced this unlawful incursion into his authority:

> I strongly disagree with Montgomery County's decision to mandate the closure of private and parochial schools. As long as these schools develop safe plans that follow State and CDC guidelines, they should be empowered to do what's best for their community. This is a decision for schools and parents, not politicians.

To emphasize the point, earlier today the Governor issued an emergency executive order making it clear that the County Health Officer cannot act upon gubernatorial emergency authority in his closure order. Executive Order 20-08-03-01. In issuing the order, the Governor made it clear that "private and parochial schools deserve the same opportunity and flexibility to make reopening decisions based on public health guidelines. The blanket closure mandate

imposed by Montgomery County was overly broad and inconsistent with the powers intended to be delegated to the county health officer."

The Health Officer's order also runs directly contrary to the guidance the State Superintendent of Education has been providing to religious and private schools since the pandemic broke in March.  As recently as July 15, 2020, the State Superintendent's office reaffirmed that the decision to open and close nonpublic schools rested with the schools themselves, and not public authorities:

> A memo from the State Superintendent of Schools, Dr. Karen B. Salmon, to registered church-exempt schools, dated March 19, 2020, stated that these schools are 'governed and operated by private organizations. The Legal Authority of each nonpublic school is responsible for making the determination regarding its school closure as a result of COVID-19.' . . . During the recovery phase from this pandemic, decisions regarding the operating status of each nonpublic school (for registered church-exempt schools) will continue to be made by the school's Legal Authority.
>
> During the recovery phase from this pandemic, decisions regarding the operating status of each nonpublic school (approved under COMAR 13A.09.09) will continue to be made by the school's Legal Authority.
>
> The success and health of all students is of paramount importance to the State Superintendent of Schools, and she truly appreciates that you have reached out to her. If  you have any additional questions, please do not hesitate to contact me at alexandra.cambra@maryland.gov or (410) 767-0407.

On June 22, 2020, the State Superintendent of Education issued a 70 page Recovery Plan for Education.  (Ex. 1, State Recovery Plan). In the updated Recovery Plan, she made it clear that the legal authority for each nonpublic school "is responsible for making the determination regarding school closure as a result of Covid-19." (*Id.* at 30).  In particular, the State Superintendent made it clear that it is up to religious and private schools to decide whether or not they follow public school closure decisions:

> A local school system may elect to open schools in a gradual fashion, (e.g. opening schools to specific grades only). If this decision is made, the Legal

Authority of each nonpublic school approved under COMAR 13A.09.10 may
choose to either gradually open in accordance with a local school system or open
to all students, as each school deems appropriate.

The Superintendent's Recovery Plan restated the guidance that the State Department of

Education has consistently provided religious and private schools since March 19, 2020, i.e., that

they are free to decide for themselves whether nor to conduct in-person learning:

> Memos to nonpublic schools approved under COMAR 13A.09.09 and registered
> church-exempt schools, dated March 19, 2020, indicated the recommendation for
> these schools to close. The memos stated that these schools are "governed and
> operated by private organizations. The Legal Authority of each nonpublic school
> is responsible for making the determination regarding its school closure as a result
> of COVID-19." During the recovery phase from this pandemic, decisions
> regarding the operating status of each nonpublic school (for both nonpublic
> schools approved under COMAR 13A.09.09 and registered church-exempt
> schools) will continue to be made by the school's Legal Authority.

In reliance upon this consistent and explicit guidance from the State Superintendent of

Education, religious and private schools in Montgomery County took extraordinary steps to plan

for a safe reopening this month.  This includes spending millions of dollars to retrofit schools,

redesign schedules and programs, and develop best COVID-19 practices.  These schools hired

and re-hired staff in reliance on this guidance, admitted students and accepted tuition payments,

and made major financial and academic commitments to reopen safely this month.

The schools' reopening plans strictly complied with the guidelines and best practices

from the Maryland Department of Health, the Centers for Disease for Control, and leading public

health and educational experts, as well as the guidance from the State Superintendent's Recovery

Plan for Education.

The County Health Officer ignored all of this.  At his webinar with nonpublic school

leaders on Wednesday, he appeared actively disinterested in visiting the schools and seeing the

extraordinary COVID-19 safety precautions which have been put in place.  He refused requests

by private schools to review the efficacy of these plans or visit their schools and has made no inquiry whatsoever in to the extraordinary efforts by these schools to reopen safely.  The County Health Officer and his staff apparently have not visited a single religious or private school to see for themselves the COVID-19 safety plans.

At the same time, the County Health Officer has refused private schools' requests to provide any guidelines or criteria on how to reopen safely, stating "we don't have as a local health department a 'here's how to do that safely.'"  While refusing to issue his own guidelines, he belittled guidelines from the Center for Disease Control, the Maryland State Health Department, and other recognized authorities that private schools have been following.  He dismissively stated that "a lot of guidelines are just that."

Unlike other facilities (e.g., bars, restaurants, nursing homes), there have been no reported outbreaks associated with religious and private schools, or secondary schools generally, undoubtedly in part because of the extraordinary safeguards imposed by these schools. The County Health Officer's order is not in response to any COVID-19 outbreak in any private or religious school.

Significantly, the County Health Officer's order applies only to religious and private schools.  The Montgomery County public system was given complete autonomy and discretion to decide when and how to open. While the public system has chosen remote learning for now, it may reopen anytime it chooses.  The County Health Officer has usurped the authority from religious and private school leaders the authority to make their own decisions as to when and how to reopen.

The County Health Officer's order, directed only at private and religious schools, appears to be the only one of its kind in the country.  Meanwhile, private and religious schools

throughout the rest of Maryland, the District of Columbia, and Virginia are preparing for safe reopenings in the coming weeks, after months of careful planning and significant expenditures.

Nonpublic schools in Montgomery County (ages 2, 3, and 4) enroll 5,650 students in their nursery school programs.  These programs, an important lifeline for working parents, will be shut down on the Health Department order.  In contrast, the County's 1,301 licensed day care programs will remain open.  While the County Health Officer has prohibited religious and private schools from operating nursery schools, *private day care centers are still being allowed to operate inside Montgomery County public school buildings.*

The order is also not directed at postsecondary schools in Montgomery County, including the University of Maryland at Shady Grove, Montgomery College, and Washington Adventist University.  Washington Adventist University is reopening this month with in-person classes. Montgomery College is utilizing a hybrid program of mostly remote learning, with some in-person classes and laboratories. UMSG is offering remote classes from its nine partner University of Maryland schools, all of which are themselves offering in-person classes and remote experience.

The County Health Officer's order was not in response to any particular COVID-19 issue at religious and private schools, many of which have been open safely for summer programs. There has been no outbreak or particular public health emergency focused on nonpublic schools in Montgomery County to prompt this order.  Instead, it appears to be a political response, an answer to complaints by some public school parents about "why their schools are closed and private schools are not."

Montgomery County Public Schools spent months preparing a comprehensive plan to reopen safely with a mix of in-person and remote learning that was released on July 14, 2020.

The plan was carefully developed after surveying system parents and extensive consultation with stakeholders.  Within five business days of it release, the Superintendent abruptly reversed himself because of an outcry from the teachers' union, the Montgomery County Education Association, and abandoned the well-developed plan, shutting down in-person learning until 2021.

The School Superintendent is free to decide when to open and close, and indeed, unlike private schools leaders, she retains this authority under the County Health Officer's order.  These decisions are within her authority. The Montgomery County public school system has one of the nation's largest public school systems, 162,680 students and 23,347 teachers and staff, most of whom are covered by extensive collective bargaining agreements.  Indeed, there are slightly more teachers in the Montgomery County public schools then there are students enrolled in all private and religious schools in the county combined.

Undoubtedly, for a system of this size with building containing large enrollments, there are many more complex and difficult political and logistical considerations than those faced with smaller private schools with more organizational and physical flexibility. For instance, Plaintiff Avalon School is 6% of the size nearby Montgomery Blair High School.  But the political and logistical challenges which burden the public schools should not prevent religious and private schools from implementing their extensive plans to reopen safely.

The County Health Officer's order is illegal because:

1.) it exceeds his authority under State and County law and the governor's executive orders;

2.) it is not rationally related to public health, especially when restaurants, bars, day care centers, 4-year and community colleges, camps, classes in the parks and other similar facilities are permitted to remain open.

3.) it was overbroad, and not narrowly tailored to any particular school  facility, but instead was extended only to one category of schools, those that were "nonpublic" (religious or private) in character.

4.) it unlawfully discriminates against religious and private schools;

Plaintiffs request temporary, preliminary, and permanent injunctive relief to prevent the closing of in-person classes at religious and other private schools.

**1.   Facts.**

Plaintiffs John and Kimberly Beahn are residents and taxpayers of Montgomery County, Maryland.  They have brought this suit in their individual capacities, and as parents and next friends of their three minor children. They, along with the other Plaintiffs, bring this suit in a class representative capacity: All nonpublic schools in Montgomery County and all students enrolled in or accepted at nonpublic schools in Montgomery County, Maryland for the 2020-2021 school year.

 The Beahns are Roman Catholic.  They have three minor children enrolled a private, Catholic school in Montgomery County, Our Lady of Mercy.  They have enrolled their children in a Catholic school to further their religious education and character development.  The family's commitment to Catholic education, and their enrollment in Our Lady of Mercy, is an important exercise of their religious beliefs.

Plaintiffs James and Gem Lawson have a child who is a rising 4th grade student at Our Lady of Mercy and were planning to send their child back to school in the fall. The Lawsons

chose to send their son to Our Lady of Mercy because of the Catholic education it provides. By not being able to send their son to any in-person instruction, he is isolated from his peers and other children and facing challenges to his ability to develop socially.

Our Lady of Mercy stated mission is to "provide[] each student the opportunity to reach full potential of mind, body and spirit" in a way that is "guided by the heritage of our Catholic faith.

On July 17, 2020, Our Lady of Mercy School sent a letter to parents and guardians, explaining that the Catholic Schools Office had provided schools with reopening guidelines to assist schools in determining a plan to reopen their campus, provide distance learning, or a hybrid of both. The reopening guidelines allow for the possibility of reopening or partial reopening utilizing social-distancing requirements. Our Lady of Mercy was enacting measures to allow for in-person learning, including mandating that faculty and students wear masks, rearranging the desks and seats in classroom to ensure physical distancing, having students eat lunch at their desks rather than the cafeteria, having students use external entrances to classrooms, staggering pick-ups and drop-offs, and having class outside if possible, among other measures.

Plaintiff Clara Obermeier's children previously attended Montgomery County Public Schools but she decided to enroll them at St. Bartholomew School after learning that public schools would not be opening for in-person instruction in the fall. Ms. Obermeier and her husband, who is an active duty officer in the U.S. Coast Guard, have jobs that do not allow them to work from home.

Ms. Obermeier and her family are Roman Catholic. They decided on St. Bartholomew because it is the school associated with their parish, St. Bartholomew Catholic Church, and will

allow their children to further their religious education and character development. Her husband teaches CCD at St. Bartholomew and her son plays CYO basketball at the church.

St. Bartholomew holds itself out as a private Catholic school that "instill[s] traditional faith-based values" and "fosters and celebrates Christian values." The school "instills in its students the importance of Christ in developing character and integrity" through "weekly Mass and community service initiatives, and daily religious instruction and prayer."

Ms. Obermeier toured St. Bartholomew prior to enrolling her children there and was thoroughly impressed by the health and safety measures that the school said it would be taking. The students would be entering and exiting classrooms through exterior doors so there would be no congregating in hallways. St. Bartholomew reduced class sizes to comply with social distancing requirements: her daughter's eighth grade class would have nine students and her son's sixth grade class would have 14 students. The school would be utilizing larger classroom spaces and would be staggering times for entering and exiting classrooms to allow for social distancing. St. Bartholomew would no longer be offering hot lunches, instead requiring students to pack their own lunches, and there would be an outdoor classroom available for instruction.

Plaintiff Miriam Roth has two sons that are going into second and fourth grade at the Torah School of Greater Washington, located in Silver Spring, Maryland. The school has approximately 385 students in kindergarten through sixth grade. It is essential to Ms. Roth, who is Jewish, that her children attend a Jewish School.

The mission of the Torah School of Greater Washington is "to cultivate a love for Torah, Judaism, and Eretz Yisrael and foster excitement for learning in each school." The students all receive both secular and Judaic education on a daily basis.

Ms. Roth was planning to send both of her school-aged to the Torah School of Greater Washington starting in early September for in-person instruction. She was required in March 2020 to put down a deposit for the 2020-2021 school year and to sign a document stating that she was going to pay the full tuition.

The Torah School of Greater Washington has taken extensive precautions to protect the health and safety of their students, including implementing social distancing and mandatory mask procedures, requiring students to carry hand sanitizer with them at all times, installing plexiglass in classrooms, having teachers wear face shields, using more areas of the school as classrooms in order to reduce the size of classes to no more than approximately nine students, purchasing a tent to allow for an outdoor space for kids if needed, and shortening the day to get rid of any extraneous activities. The school was also planning to offer continued distance learning for any students that requested it.

The Health Officer's order provided no exception for in-person special education instruction, which causes harm to Ms. Roth's fourth-grade son who has Dyslexia and ADD. Prior to the closure of the Torah School of Grater Washington in March, her son received one-on-one or two-on-one special education about 30 to 40 percent of the day, with the rest of the day spent in with his entire class. When the school closed in the spring due to COVID-19, her son still received some one-on-one instruction via Zoom but he was not getting anything out of the lessons. Her son was unable to focus on the computer, which would lead him to get extremely frustrated. There was a special education teacher at the school that her son had developed a close and productive relationship with prior to the pandemic who gave him lessons but, due to the frustrations resulting from Zoom learning, her son no longer wants to work with that teacher.

Prior to the pandemic, Ms. Roth's younger son was receiving individualized one-on-one enrichment instruction because he is at an advanced reading level. While he was still receiving some enrichment instruction via Zoom during the spring, the lessons were shorter and not nearly as effective as the in-person lessons.

Ms. Roth and her husband had planned for their two older sons to go back to school for in-person instruction beginning in September. Both Ms. Roth and her husband have full time jobs and also have a one-year old and three-year old at home, making it extremely difficult to get their work done while watching four children under the age of nine.

Plaintiffs Joshua and Penny Bortnick have a daughter who is a rising 8th grade student at Charles E. Smith Jewish Day School ("CESJDS") in Montgomery County. They were planning to send their daughter back to CESJDS for in-person education if the school opened for it. CESJDS's mission is to "engage students in an exemplary and inspiring general and Jewish education, to ensure a vibrant Jewish future in order to foster the growth of confident and compassionate thinkers to engage the world through Jewish values."

CESJDS  announced on July 8 that it was preparing for several scenarios—full return to campus, a hybrid approach, and distance learning—and was focusing on the hybrid approach. Two days later, the school announced health and safety measures for students, faculty, and staff for a safe return to school, including installing plexiglass shields to certain areas, separating desks, adding touch-free faucets to bathrooms, reducing class size, requiring that face coverings be worn, suspending all group gatherings, and requiring all students and employees submit self-screening data each day, among other measures. CESJDS emailed families on July 17, 2020 with an update on its plans for the reopening of schools in August and announced that the school

would make a decision by August 6 as to its learning plans for lower school, middle school, and high school.

The Bortnicks' daughter has struggled to adjust to virtual learning. She had transferred to CESJDS the prior year and was still in the process of making and developing friendships, which is nearly impossible when the only option is virtual learning. The Bortnicks are on a 10-month payment plan for CESJDS and have already made the first two payments for the upcoming school year.

Plaintiffs Christopher and Meagan Rizzo have a son who is a rising fourth grade student at The Heights School ("The Heights") in Potomac Maryland. The Heights is an all-boys private school for grades 3-12 with a student body population of 540 students and 65 faculty members. The Rizzos were planning to send their son to the Heights this fall for in-person instruction, recognizing the importance to growth and development of their young child that only face-to-face learning can provide.

The Rizzos had heard from The Heights that it had been taking steps to allow for face-to-face instruction to happen in the fall, including plans to expand the use of outdoor space and possibly having the upper school engage in virtual learning but allowing the middle and lower schools to come to school. Given the smaller enrollment of The Heights and its larger indoor and outdoor space compared to many public schools, The Heights is in a unique position—along with many other religious and private schools in the County—to be able to safely open.

The Rizzos had been counting on their son returning to in-person education in the fall. Meagan Rizzo is a physician who runs a clinic in an area hospital and has been treating COVID-19 patients since the pandemic began. Due to her job and her husband's job—which may require out-of-state travel beginning next month—the Rizzos will need to hire a childcare provider to be

with their son during the day if The Heights is not permitted to open. The Rizzos will have to pay for a childcare provider on top of paying the full Heights tuition.

The Rizzos chose to send their son to The Heights because of the character and spiritual development he would receive there. The Rizzos' son receives religious education three days a week and all students in the lower school are assigned a mentor. The spiritual development and education that her son receives through the school does not translate in virtual learning, particularly to young students. A particular draw of the school is the mentorship that it provides to its young students, who is available to help the boys develop intellectually, morally, and spiritually. This mentorship is nowhere near as effective, frequent, or accessible to young students when not in person.

Plaintiff The Avalon School is an independent, all-boys Catholic school offering grades K-12 in Silver Spring, Maryland. The school has approximately 180 students enrolled for the 2020-2021 school year. The school is well-recognized for its diverse student population, including a large population of Hispanic and African American students. The Avalon School is recognized by the Archdiocese of Washington and offers daily mass, with a requirement that its students attend mass on the holy days of obligation. There is a priest on staff, and Catholic education is taught to all students five days a week.

Plaintiff The Brookewood School, which is affiliated with the Avalon School, is an independent, all-girls Catholic school offering grades 1-12 in Kensington, Maryland. There are approximately 142 students enrolled for the 2020-2021 school year. The Brookewood School similarly offers mass every day and requires its students to attend mass on the holy days of obligation. There is a priest on staff, and students take religious classes each day.

14

Prior to the Health Officer's order, both the Avalon School and the Brookewood School were planning to reopen for in-person learning on September 3. Since the spring, the schools have been setting forth a plan for reopening, which has included setting up a taskforce to oversee reopening, purchasing digital scanning thermometers, marking sidewalks based on social distancing requirements, purchasing smaller desks for the Brookewood School to better allow for social distancing, reducing class sizes, cancelling sports, and cancelling the schools' transportation program, which previously had allowed staff to transport students to and from school in 13-person passenger vans.

The Avalon School has been operating an academic summer camp for boys and girls since June 22, 2020 and the summer camp is still currently operating. The summer camp is operating in compliance with CDC guides and State orders. The camp has been a success this summer, and there have been no incidents of COVID-19.

In addition to the Torah School of Greater Washington, CESJDS, the Avalon School, the Brookewood School, Our Lady of Mercy, and St. Bartholomew, most other religious and private schools in Montgomery County have made an extraordinary investment of resources and efforts in the last three or more months to plan for a safe reopening. This extraordinary effort has been based on guidance from the Center for Disease Control, the Maryland Health Department, the State Department of Education, and recognized public health experts.

These efforts vary from school to school, depending upon size and layout.  They include, but are not limited to:

1.) retrofitting schools to reduce classroom size and protect social distancing;

2.) installing plexiglass between desks in classrooms and other facilities to protect teachers, students and staff;

3.) investing in tenting to expand space and utilize outdoor spacing

4.) introducing mandatory temperature readings each morning from faculty, students and staff;

5.) expanding the number of school entrances to encourage social distancing;

6.) institution of cleaning and handwashing throughout the day, and evening power washing;

7.) mandatory masks for all teachers, students and staff;

8.) revamped class schedules to limit hallway movements throughout the day. Some schools have banned hallway usage altogether where each classroom has an exit directly to the outdoors; and

9.) limited lunch in small cohorts.

These efforts have been taken at considerable expense, with many schools operating on a shoestring budget, despite the popular stereotype of "private schools."  These include fundraisers, volunteer efforts, and donations of expertise and effort from skilled members of the school community.

The order also impacts nonpublic special education schools serving disabled students in Montgomery County.  These schools were expressly authorized by State Superintendent of Education Karen Salmon to reopen on June 10, 2020 following safety guidelines.  Now, under the County Health Officer's Directive, they must abruptly close today, effective 6:00 a.m. this morning.

Ironically, while many public facilities have introduced safeguards, there is no indication that effort to this extraordinary degree has occurred in comparable facilities in Montgomery

County, i.e., restaurants, bars, day care, etc. which are not subject to the County Health Officer's closure order.

The Beahns and other parents have acted in reliance upon these extraordinary efforts to ensure a safe reopening. They have had a reasonable expectation that Our Lady of Mercy would provide religious and academic education for their children beginning this month. They have paid nonrefundable tuition for their children to attend school this fall. They have organized their work and personal lives based upon the reasonable expectation that their children would be spending school days in the school classroom. They have foregone opportunities to place their children in the hundreds of private schools throughout the Washington region outside Montgomery County that remain open.

**2. Montgomery County Public Schools.**

Public schools in Maryland are creatures of the General Assembly and are governed by state and not county law. *See McCarthy v. Board of Education of Anne Arundel County,* 280 Md. 634 (1977). While the Montgomery County public schools are governed by an elected board of education, it is ultimately subject to the visitorial power of the State Board of Education, which acts through the State Superintendent of Schools. *See Board of Education of Talbot v. Heister*, 392 Md. 140 (2006); Md. Code Ann., Educ. § 2-205. "Our cases have long made clear that the State Board has very broad statutory authority over the administration of the public school system in this State." *Board of Educ. of Prince George's County v. Waeldner*, 298 Md. 354, 359-60 (1984).

On March 12, 2020, Governor Hogan and State Superintendent of Schools Salmon suspended in-person classes in Maryland public schools. Religious and private schools were not ordered to close, but were recommended to close. On May 6, 2020, Governor Hogan and the

State Superintendent of Schools, Dr. Karen Salmon, announced that all public schools for in-person learning in Maryland for the remainder of the 2019-20 school year.  They announced that they would work on planning for reopening in the fall.

In June, the State School Superintendent issued "Maryland's Recovery Plan for Education," a comprehensive 70-page plan to guide public schools in making safe reopening decisions for this fall. (Ex. 1, Recovery Plan). The Recovery Plan cites CDC and other expert sources extensively, and details extensive options and best practices for school administrators to consider when reopening.  While it applies only to public schools, the plan included a section on recommendations for the reopening of non-public schools, and many religious and private schools consulted it and relied upon it extensively in making their own reopening plans.  (*Id.* at 30). Neither Montgomery County, nor its County Health Officer, ever issued its own reopening guidance, or contradicted the State's guidance.  In fact, last Wednesday, the County Health Officer adamantly declined to provide such guidance to leaders of Montgomery County's religious and private schools.

 On July 22, 2020, the State Superintendent requested each public school system to submit their reopening plans by August 14, 2020.  She stated that "we want to get our students back to school as soon as possible for in-person instruction, and this should be the driving goal and the basis for all of our decisions. Public health experts, including the American Academy of Pediatrics, agree." (Ex. 2, Salmon Remarks).  Dr. Salmon emphasized the importance of CDC guidelines and adherence to "state health protocols," which the County Health Officer dismissively referred to.  (*Id.*).  The County Health Officer has not alleged that any religious or private schools fail to comply with CDC guidelines, the Maryland Recovery Plan, or any state or county health protocols in their planed reopening.

On July 14, 2020, the Montgomery County school superintendent, Jack Smith, Ph.D.

issued a detailed 21-page for reopening in-person education in Montgomery County at the end of

this month:

> ***The 2020-2021 school year will begin on Monday, August 31, 2020, for all students.***
> ***Students will return to schools on a rotational schedule for in-person learning with***
> ***reduced class sizes and reduced numbers of students in the buildings***. Due to limited
> capacity, transportation resources will be prioritized to elementary and middle school
> students. The goal is for all grade levels to be in a school rotation by end of
> November. Students will return to classrooms by grade level, last   name/address, and
> cluster in phases over the first months of the school year.

(Ex. 3, MCPS Plan, at 7) (emphasis supplied).

Dr. Smith said the draft plan was based on "guidance we have received from the

Maryland State Department of Education and from our county health partners," which is how he

has referred to the County Health Officer. The 21-page plan summarized strategies for safe in-

person reopening, including bus transportation, use of marks, and allowing parents to select other

learning modes, including remote learning for their children.  The plan had been developed after

conducting a major parent survey in June which favored in-person education, and substantial

engagement with all stakeholders in the previous month.  While Dr. Smith emphasized that the

plan was in draft form, he also said it was the product of many months of careful planning.  This

was clearly a draft ultimately intended for submission to the State Superintendent.

Two days later after the school system draft reopening plan was issued, on Thursday

evening, July 16, 2020 the Montgomery County teachers union held a closed door town hall for

union members.  School administration officials were present but did not speak.  The next

morning, Friday, July 17, 2020, the teachers union issued a statement blasting the school

reopening plan, issuing a statement saying that "is wholly inadequate to protect the health and

safety of students and staff."

Two business days later, on Tuesday, July 21, 2020, Dr. Smith announced that the school system was abandoning the draft reopening plan it had announced just seven days earlier. Instead, the school system would remain in a "virtual-only instructional model" through the first semester – January 29, 2021. Dr. Smith said this change was based upon "additional guidance" received from the County Health Officer the day before, remarkably issued on the day after the teachers union opposition was announced. The reversal occurred even though the reopening plan released the previous week had been released upon guidance from "our County health partners."

In response to the school system's reversal, many Montgomery County parents, such as plaintiff Clara Obermeier, decided to remove their children from Montgomery County Public Schools and place them in private schools.  Ms. Obermeier's children had been attending Thomas W. Pyle Middle School, and she enrolled them in St. Bartholomew's, a Roman Catholic K-8 school in Montgomery County.

These withdrawals will obviously impact the Montgomery County public school system. Montgomery County schools had been anticipating 3,500 new students to enroll this August, but as of last week, only 300 new K-12 students had enrolled. Montgomery County's state funding is predicated upon its per-pupil enrollment numbers each fall. *See* ED §5-202.

Soon after, some Montgomery County parents and interest groups began to raise "equity" concerns about public school students having to learn remotely, while religious and private schools were conducting in-person classes.  Last Wednesday, July 29, 2020, the County convened a webinar with leaders of Montgomery County religious and private schools.

The program began with Earl Stoddardt, Montgomery County's director of emergency management and homeland security, stating that they wanted to provide information about current trends and how they "could impact when and how you all choose to open."  Director

Stoddardt said that "we know you are actively all are actively considering how this impacts your ability to reopen and we wanted to make routine updates."  Despite these statements, Montgomery County had no intention of respecting the schools' ability to choose "when and how to open."

During the webinar, the County Health Officer, said he could not offer guidance to the schools about reopening:  "We don't have as a local health department a 'here's how to do this safely which is why we are meeting with you all to have this discussion, taking your questions." Instead, he referenced the CDC and State Department of Education reopening guidelines, and Plaintiff schools have complied with all applicable guidelines, although at the same time he denigrated their guidelines stating "they are just that."[1]

The CDC guidelines provide extensive strongly encourage safe reopening, stating what is obvious to most parents:

> Reopening schools will provide in-person instruction for students, facilitate increased communication between teachers and students, and provide students with critical academic services, including school-based tutoring, special education, and other specialized learning supports.
>
> Studies show that students have experienced learning loss during the period of school closure and summer months. In-person instruction for students has advantages over virtual learning, particularly when virtual learning was not the planned format for instruction, and schools may not have the resources or capability to transition fully to virtual learning. In-person classroom instruction has the added benefit for many students of interpersonal interaction between the student and the teacher and the student and peers. Teachers are able to more actively participate in student learning, provide feedback as students encounter challenges, and promote active learning among students.
>
> In-person instruction may be particularly beneficial for students with additional learning needs. Children with disabilities may not have access through virtual

---

[1] The CDC guidelines strongly encourage safe reopening, pointing out that "School closure disrupts the delivery of these critical services to children and families, and places additional economic and psychological stress on families…"

means  to the specialized instruction, related services or additional supports required by their Individualized Education Programs (IEPs) or 504 Plans. Students may also not have access through virtual means to quality English Language Learning (ELL).[2]

The County Health Officer made it clear that he was not familiar with the extraordinary retrofitting, revamping and rescheduling that religious and private schools have undertaken to reopen safely. He said "we can't physically visit every school." Instead, he would deal with the "respective schools as a unit," not understanding that the religious and private schools are not a "unit" but a very diverse group of independently operated institutions.

It appears the County Health Department has not even visited a single religious or private school, while it has found the time and resources to visit numerous bars and restaurants, including the Vibes Hookah Lounge at 1 Dawson Avenue in Rockville, the Cabana Hookah Lounge, at 8227 Georgia Avenue in Silver Spring and the Palisades Lounge at 211 Georgia Avenue in Silver Spring.[3]

The County presumably believes under the new executive order that has the authority shut down bars and restaurants, which have been documented by the CDC as the leading source of COVID-19 transmission. But instead of restaurants and bars, the County has used its purported closure authority to target religious and private schools. Indeed, while the County Health Officer professes to have no resources to inspect or even learn about the expensive and impressive retrofitting of these schools, the County has found ample resources to inspect bars and restaurants.

---

[2] CDC Reopening Guidelines, updated August 1, 2020: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/prepare-safe-return.html#important
[3] Indeed, on July 11, 2020, Defendant Elrich posted on social media a picture of himself attending a live music concert at Brookville Beer Farm, a Rockville brewery.

The County Health Officer's blithe attitude toward religious and private schools even extended to the extensive investment of many schools in installing plexiglass dividers in the classrooms, which the State and County have not required anywhere. When asked about the plexiglass dividers, the County Health Officer responded that it was a "niche" issue, and he would like to "learn more about what respective schools are doing because not everyone will be able to afford plexiglass."

The County Health Officer would not provide an answer to specific questions about which metrics would decide opening and close recommendations.  He stated that his guidance on closing is based on "where we stand as county, where we stand a state and certainly where we stand as a nation." He later acknowledged that in Montgomery County, "we have plateaued to some degree. Our test positivity has improved."  Montgomery County's positivity rate, a key measure, has now declined for 14 straight days.  It now stands at 2.3 percent, half the state average of 4.6 percent, one of the lowest in the state. (The WHO recommends before reopening, that a jurisdiction should have a positivity rate of below 5.0% for 14 consecutive days.)

Two days later, on Friday evening, July 31, 2020, at 8:00 p.m., the County Health Officer issued an order purporting to prohibit in-person learning at religious and private schools.  (Ex. 4, July 31 Order). The order was captioned "**COUNTY HEALTH OFFICER DIRECTIVE AND ORDER REGARDING PRIVATE AND INDEPENDENT SCHOOLS."**  It stated authority was "pursuant to State Executive Order 20-07-29-01," the governor's revised executive order issued two days earlier.  The County Health Officer claimed to be acting as the "designee for Robert R. Neall, Secretary of Health for the State of Maryland."

In the "Directive," the County Health Officer prohibited "non-public schools" in Montgomery County from physically reopening for in-person instruction through October 1,

2020." These schools were deemed to include "all private pay schools, schools affiliated with religious institutions, or schools that are otherwise considered to be independent schools" The order was made effective at 6:00 a.m. today, the following Monday, August 3, 2020. The order also threatened criminal penalties against anyone violating its terms: A person who knowingly and willfully violates this Order or any Local Order is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both.

The County Health Officer's abrupt decision to shut down in-person learning in religious and private schools was not based upon public health concerns, but in response to "equity" issues about public school students having to learn remotely while religious and private schools students have in-person classes. The County Health Officer's concerns about "public health" were pretextual. There have been no COVID-19 outbreaks in public schools. There has not been a single reported case of an infection a Montgomery County religious or private school.

The County Health Officer did not and was unwilling to consider the significant investment extraordinary precautions under taken by plaintiff schools and private and religious schools in Montgomery County to safely reopen. He was unwilling to articulate any reasonable metrics for opening and closing. While Montgomery County's COVID-19 positivity rate is among lowest in the State, it is the now only jurisdiction in the State – and the country – which seeks specifically to shut down in-person classes at religious and private schools.

The County Health Officer's last minute order was a surprise both to the schools, as well as the parents and the students. Throughout the summer, the County government had been advising religious and private schools to "follow CDC guidelines." Now, the County Health Officer states they are "just that, guidelines."

24

The County previously indicated it lacked any authority to make decisions about closing religious or private schools. For instance, on May 22, 2020, the County's manager of environmental health at HHS wrote to the head of the Avalon school stating

> Thank you for contacting the Montgomery County Department of Health and Human Services regarding guidance for private schools.  At this point, Montgomery County does not exactly know if local government will play a role if schools will be able to operate.  It will depend on if the Governor and the Maryland Department of Education give power to the local authorities and what the status is regarding case load and potential surge of the virus moving into the fall.

(Ex. 5, May 22 Email).

The environmental health manager state that "until we know more, we are advising all facilities, plan to open as normal with modifications and policies in accordance with the CDC guidance," and the attached the link to the CDC school reopening guidelines.  (*Id.*). Avalon School and other religious and private schools did exactly that, relying upon the CDC guidelines and the published guidance from the State Department of Education, in making large scale investments into safe reopening.  The County Health Officer's last-minute directive on Friday night turned all of this upside down.

### 3. Extraordinary Impact and Irreparable Harm of Shut Down Order.

The shutdown order caught thousands of Montgomery County families by surprise. During the 2019-20 school year, there were 22,312 students enrolled in nonpublic schools in Montgomery County, including K-12 and nursery schools. Of these, 40 percent, 9,345 are enrolled in religious schools. There are more than 180 religious and other private schools in Montgomery County.

These students have enrolled to attend religious and private schools this fall.  The parents have paid the nonrefundable tuitions, many working major financial and lifestyle sacrifices to

give this opportunity to their children. The schools have made investments in physical plant restructuring and revamping, following best practices issued by the CDC, the State Department of Education and recognized experts.

Working parents have relied upon the school building reopening for their child care, and the County Health Officer's order imposes an extraordinary financial burden upon them to find alternative care, ironically at day care centers which will be wide open. (Pre-K and nursery care at religious and private schools are shut down under the Directive.)  This order came at the last minute without any warning to the community, which had consistently relied on guidance from the State Superintendent of Education that nonpublic schools could make their own opening and closing decisions.  Parents who could have sent their children to religious, private or other schools missed that opportunity, even though private schools have the right to open in every other Maryland jurisdiction, as well in the District of Columbia and Virginia.

Parents sending their children to religious schools will suffer irreparable harm in the interference of the free exercise of their faith. Plaintiff Miriam Roth is sending her two sons, a 2nd and 4th grader, to the Torah School so they can experience "love for the Torah, Judaism and *Eretz Yisrael* ("the Promised Land of Israel")."  This will be substantially impaired by the County Health Officer's order.  Similarly, Plaintiff Clare Obermeier removed her children from Montgomery County Public Schools and is sending her children to St. Bartholomew because the school "instills in its students the importance of Christ in developing character and integrity" through "weekly Mass and community service initiatives, and daily religious instruction and prayer."  The County Health Officer's order prevents and impairs this free exercise their religion.

The County Health Officers' abrupt order significantly interferes with the right of the Plaintiffs to obtain classroom education for their children. The County's message to the Ms.

Obermeier and others seems to be "if you can't get classroom instruction in the public schools, we won't let you pay for it elsewhere because that wouldn't be fair." The importance of in-person learning, and harm caused by deprivation of classroom instruction, are well-documented by both Federal and State authorities. The impact of the deprivation is particularly severe for students like Ms. Roth's fourth grade son, who suffers from Dyslexia and ADD.  The in-person education with a dedicated specialist at the Torah School resulted in significant improvements in his academic performance, but his learning challenges made it difficult to focus during remote learning, and his progress suffered significantly.

Many Plaintiffs are working couples who now face significant child care decisions.  Their budgets – some tight because of commitments to religious education – now must also find money for appropriate day care, if it can be located, in addition to the tuition payments they have already made.

Meanwhile, the school themselves face significant challenges.  Do we have to layoff faculty and staff?  Do we have to refund tuition?  What about international students who board with us?

At the same time, the County Health Officer's summary order raised more questions than it answered.  For instance: 1.) Since county day care programs are operating, can early childhood programs and kindergarten take place, especially since those programs are not truly susceptible to remote learning?; 2.) Do religious and private schools have the ability to offer small, in-person, physically distanced groups for social, emotional, athletic or other programming, either indoors or outdoors?; 3) What efforts were undertaken to analyze the safety and preventative measures implemented by individual schools?; and, importantly, 4.) What criteria will be used to determine when schools will be safe for students and faculty to return to campus?

In his rush to issue the Friday night order, the County Health Officer did not consider any of these important issues. The last, reopening criteria, is particularly important.  In his webinar on Wednesday with leaders of religious and private schools, the County Health Officer refused to articulate any criteria, either for closing or reopening, other than stating that the County should be striving to get to cases in the single digits or teens per day.

### 4.    Authority of the Montgomery County Health Officer.

Defendant Montgomery County is a municipal corporation and has been organized as a home rule county under Md. Const. Art. XI-A since the adoption of its charter November 2, 1948.  Defendant Marc Elrich was elected county executive on November 6, 2018.  Defendant Travis A. Gayles is the Montgomery County Health Officer.  Gayles also serves a division director in the Montgomery County Department of Health and Human Services, and ultimately reports to Elrich.

As home rule county, the Montgomery County government has no authority regulate either public or private schools.  Such authority is exclusively vested in the General Assembly, which has delegated regulation of both public and private schools to the State Board of Education.  *McCarthy v. Board of Education of Anne Arundel County,* 280 Md. 634 (1977).  See also ED § 2-206(d)-(j).  Historically, Maryland counties have never exercised any authority over private or public schools.  Indeed, the State's preemptive authority in the field of education dates back to the early 19th century.  *McCarthy,* 280 Md. at 638-641 (*citing* B. Steiner, *History of Education in Maryland* 22 (1894)).

Under state law, County Health Officers act "under the direction of the Secretary [of Health], [to enforce] the State health laws and the policies, rules, and regulations that the

Secretary adopts." HG §3-306(c)(4)(i)(1).  They also enforce "rules and regulations" of the County Board of Health.[4]

Under the county code, the County Health Officer is authorized to post warning signs "the County Health Officer is hereby authorized to post placards or warning signs on the premises on which a person is infected with a communicable disease dangerous to public health" and to imposes criminal penalties on unauthorized persons who remove the warning signs. Montgomery County Code, § 24-2,3.

The State has adopted extensive regulations for communicable diseases, and the role of County Health Officers in controlling diseases.  COMAR10.06.01.01, *et seq*.  These include the power to quarantine certain tuberculosis patients (COMAR 10.06.01.20.A.3.B) and impose restrictions on food handlers exposed to salmonella (COMAR 10.06.01.06.E.5), and similar matters.   Nothing remotely in the state communicable disease regulations authorizes a local County Health Officer to issue a blanket order closing schools.

In his order, the County Health Officer does not purport to exercise any home rule powers of the County government or particular statutory authority. Instead, he cites no authority at all except that he is acting "as the designee for Robert R. Neall, Secretary of Health" for the State of Maryland. His order is captioned "Pursuant to State Executive Order 20-07-29-01." This executive order was issued by Governor Hogan five days ago, on July 29, 2020, and just two days before the County Health Officer issued his Directive.

---

[4] In Montgomery County, like most counties, the County Council sits as the Board of Health. Sec. 24-1, County Code.  The Board of Health is authorized to "to adopt and enforce all needful rules and regulations concerning sanitation for eating and drinking establishments, habitable buildings and private water supplies, within their jurisdiction." *Id.*

In other words, the County Health Officer's purported authority relies entirely upon the governors' executive order, and not on an inherent authority under any particular statute or ordinance.

**5. Emergency Authority and the Governor's Executive Orders.**

On March 5, 2020, Governor Hogan issued a proclamation declaring a state of emergency under his authority under Md. Code Ann., Pub. Safety § 14-303. He issued a gubernatorial proclamation making a Declaration of State of Emergency and Existence of Catastrophic Health Emergency under his authority under PS §14-3A-02.[5]  The Governor has now issued multiple executive orders, many of which clarify, expand or narrow prior executive orders.[6]

Contrary to the County Health Officer's assertion, the Governor's executive order, on July 29, 2020, does not delegate to him, the authority to close-in person learning in religious and public schools.

---

[5] Section 14-303 authorizes the governor to proclaim a state of emergency and to promulgate "reasonable orders, rules and regulations" to "protect life and property or calculated effectively to terminate or control the public emergency." PS § 14-3A-02 authorizes the governor issue a catastrophic health emergency proclamation, which he may extend for successive 30 day periods. Section 14-3A-03(d)(2)  authorizes the governor "[i]f necessary and reasonable to save lives or prevent exposure to a deadly agent, the Governor may order individuals to remain indoors or refrain from congregating."

[6] Order issued March 12, 2020, "Prohibiting Large Gatherings and Events and Closing Senior Centers,"as amended and restated on March 16, 2020, and further amended and restated on March 19, 2020 by Order Number 20-03-19-01, and further amended and restated on March 23, 2020 by Order Number 20-03-29-01, and further amended and restated on March 30, 2020 by Order Number 20-03-30-01, and further amended and restated on May 6, 2020 by Order Number 20-05-06-01, and further amended and restated on May 13, 2020 by Order Number 20-05-13-01, and further amended and restated on May 27, 2020 by Order Number 20-05-27-01, further amended and restated on June3, 2020 by Order Number 20-06-03-01, and further amended and restated on June 10, 2020 by Order Number 20-06-10-01, is further amended and restated in its entirety as set forth herein.

The County Health Officer presumably relies upon the language in State Executive Order 20-07-29-01, which provides that:

> If a political subdivision determines that doing so is necessary and reasonable to save lives or prevent exposure to Covid-19, the political subdivision is hereby authorized to issue orders that are more restrictive than this Order ("Local Orders"):
>
>     i.   requiring any businesses, organizations, establishments, or facilities to close and/or modify their operations; and
>
>     ii.   requiring individuals to remain indoors or to refrain from congregating.

As a threshold matter, the authority is delegated to the "political subdivision" and not to the County Health Office. It has long been established that legislative grant of public health police powers to a "political subdivision" invests sovereign authority in the "governing body." *Fowler v. Board of County Commissioners,* 230 Md. 504, 507 (1962).  The "governing body" in a chartered county is "the county executive and county council acting together."  *Montgomery County v. Anchor Inn Seafood Restaurant*, 374 Md. 327 (2000).

Despite the title of "County Health Officer," the Defendants cannot simply act as the "political subdivision" without more than the governor's executive order, any more than the fire chief or the police chief could. There is nothing in state or county law or the Governor's executive order which gives him the authority to simply exercise this important grant of emergency authority to the political subdivision. The "political subdivision" has made no such predicate determination that closing religious and private schools "is necessary and reasonable to save lives or prevent exposure to Covid-19." He cannot simply choose to act by himself on behalf of the "political subdivision."

The distinction between "political subdivision" and "local health officer" is important, and Governor Hogan has carefully made that distinction in his executive orders.  The Governor

has carefully defined what authority he is delegating expressly to Local Health Officers.  In Executive Order 20-04-05-02, "Delegating Authority to Local Officials to Control and Close Unsafe Facilities," Governor Hogan authorized local health officers to close an "Unsafe Facility" which is defined as one "unable or unwilling to operate in a manner that does not pose an unreasonable risk of exacerbating the spread of COVID-19 (including, without limitation, as a result of non-compliance with Social Distancing Guidance)." (Ex. 6, Order 20-04-05-02).

For such an "Unsafe Facility, the Local Health Officer is empowered to "require the Unsafe Facility to modify its operations to comply with Social Distancing Guidance"; or "designate all or part of the Unsafe Facility as a zone in which the occupancy and use of buildings may be controlled, and prohibit or limit the movement of individuals and/or vehicles into, in, or from the Unsafe Facility."  (*Id.* § II.b).

Here, the County Health Officer has not, and cannot, declare all Montgomery County religious and private schools an "Unsafe Facility."  The order requires an individualized judgment about a particular facility, not a blanket determination about all religious and private schools.  Secondly, the County Health Officer cannot show that religious and private schools, any or all of them are "unable or unwilling to operate in a manner that does not pose an unreasonable risk of exacerbating the spread of COVID-19."  To the contrary, they have made extraordinary effort and investment to operate in a manner which does not impose unreasonable risks.  Finally, the County Health Officer's remedy is to simply order compliance with social distancing, or designating "all or part of the Unsafe Facility" as an unsafe zone, limiting the movement of persons or vehicles, or "closing the Unsafe Facility."

Here, the County Health Office seeks to ignore and circumvent the plain requirements in the Executive Order 20-04-05-02.  He seeks to close religious and private schools without

making the predicate finding required to designate an "Unsafe Facility," *i.e.,* that they are "unwilling or unable" to operate safely.  Nor has he pursued the remedy of allowing the schools to impose social distancing (which the schools have already instituted).

There is no indication that Governor Hogan intended the language in the executive order to permit the County Health Officer to close schools—quite the opposite.  The order explicitly applies to "businesses, organizations, establishments, or facilities."  (*Id.*).  It does not reference schools, and in fact, is directly contrary to the consistent and explicit guidance from the State Superintendent of Education.

The administrative history of an executive order is often critical to determining its meaning, especially in COVID-19 emergency cases.  *See, e.g., Ass'n of Jewish Camp Operators v. Cuomo*, 2020 U.S. Dist. LEXIS 117765 (N.D.N.Y. July 6, 2020). Since the outbreak of the pandemic, no gubernatorial order has referenced schools, public or private.  Of the 76 orders, proclamations, and guidance statements issued by Governor Hogan since the outbreak of the pandemic, not one has mentioned either public or nonpublic schools.[7] Instead, consistent with Maryland's historic and statutory framework, Governor Hogan has consistently worked in collaboration with the State Superintendent to provide direction and guidance to the education community, without issuing executive orders of his own directed to either public or private schools.

In fact on July 22, 2019, Governor Hogan appeared with State Superintendent Salmon at a press conference to discuss school reopening.  At the press conference with the governor,  and in subsequent written statements, the Superintendent reaffirmed the importance of the" Maryland

---

[7] The Governor's executive order do mention "self-defense schools" (e.g. Karate and Kung-fu) which, unlike religious and nonprivate schools, have been permitted to open in Montgomery County and throughout the State. ¶ III.g.

Recovery Plan for Education, which follows the State's overall recovery plan and the governor's executive orders." That plan continues to make clear that the decision to open or close nonpublic schools rests exclusively with them. (Ex. 1, State Recovery Plan, at 30).

Now the County Health Officer seeks to hijack the governor's executive order process, and to go where Governor Hogan has refused to, which is to use the emergency executive orders to regulate schools, in this case religious and private schools. This has extraordinary implication for both public and nonpublic education and directly interferes with the traditional role of the State Superintendent of Education and her careful governance of education in Maryland. It is also is an extraordinary misuse of the purported delegation gubernatorial emergency authority.

Earlier today, Governor Hogan made the intent of his executive orders clear. He issued Executive Order 20-08-03-01, which excludes "schools" from the authority delegated to political subdivisions to issue more restrictive closing orders. In issuing the Order, the Governor made his intent clear:

> The recovery plan for Maryland public schools stresses local flexibility within the parameters set by state officials. Over the last several weeks, school boards and superintendents made their own decisions about how and when to reopen public schools, after consultation with state and local health officials.
>
> Private and parochial schools deserve the same opportunity and flexibility to make reopening decisions based on public health guidelines. The blanket closure mandate imposed by Montgomery County was overly broad and inconsistent with the powers intended to be delegated to the county health officer.
>
> To be clear, Maryland's recovery continues to be based on a flexible, community-based approach that follows science, not politics. As long as schools develop safe and detailed plans that follow CDC and state guidelines, they should be empowered to do what's best for their community.
>
> I want to thank all the parents, students, and school administrators who have spoken out in recent days about this important issue.

As Governor Hogan observed on Saturday, "As long as these schools develop safe plans that follow State and CDC guidelines, they should be empowered to do what's best for their community."

Moreover, there is no rational basis for the political subdivision or County Health Officer to make a determination that here that closing religious and non-private classroom instruction is both "necessary" and "reasonable" to "save lives" or "prevent exposure to Covid-19 as required by Executive Order 20-04-05-02. First of all, the County Health Officer has no basis to make a judgment that it is "necessary" or "reasonable' to close down classrooms in religious and private schools to "save lives" or prevent COVID-19 exposure.

"Necessary" means there is no reasonable alternative.   In dealing with constitutional rights, courts have held that "necessary" and means the "least intrusive means" of achieving the governmental interest. *See, e.g., United States v. Chavez,* 734 F.3d 1247 (10th Cir. 2011).  The County Health Officer cannot demonstrate that he has chosen the least intrusive alternative. Indeed, in the County's webinar on Wednesday, it was clear that he refused to even understand that reasonable and extraordinary alternatives to closure that religious and private schools have put in place. The County Health Officer made it quite clear during the County's webinar last Wednesday that he and the County health staff has no willingness or ability to visit any or all of the religious and private schools. Instead, he said he would deal with the "respective [private] schools as unit," a phrase he repeated.

It appears the County has not visited or inspected even a single religious or private school, or taken steps to understand the extensive precautions nearly all have taken.  Indeed, he admitted that before the abrupt public school reversal, that they had visited only a single public school.

"Reasonable" has been repeatedly defined by Federal courts as that which is "fair proper, just moderate, suitable under the circumstances." *See, e.g., Evans v. United States*, 824 F. Supp. 93 (S.D. Miss. 1993). The County Health Officer cannot demonstrate that his actions are any of these things. Here, "reasonableness" must be seen in the context of how the County Health Officer is exercising its discretion toward other places where the public assembled. All of the bars and restaurants in the County have been permitted to reopen, subject to the limitations in the governor's executive order. The day care centers are open. The gymnasiums are open. The mail salons are open. Some of the colleges are open. The Parks Department is now *reopening* classes and camps.

Until Friday evening, throughout the height of the pandemic, the County has made no efforts to interfere with the operations of the religious and private schools since the COVID-19 crisis erupted in late February and early March. Indeed, some of these schools offered summer or other programs safely, without interference from the County, and without any outbreak of COVID-19. In contrast to other facilities, there has not been a single reported case of an outbreak of COVID-19 at any religious or private school since the pandemic began.

Religious and private schools do not prevent some new COVID-19 threat justifying this last-minute, surprise order on the eve of school reopening. The only thing that has changed is that public school system, at the behest of the teachers' union, has itself abruptly changed course and closed their classrooms, despite the wishes of many parents who wanted schools to reopen for their children. This has created a political dilemma, not a public health problem: How to explain to these same parents why the religious and private schools are still operating?

The answer is not an unlawful shutdown of their classrooms.

**6.    Injunctive relief should be granted to prevent irreparable harm.**

"The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties.'" *N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37-38 (2d Cir. 2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 [1981]). "A preliminary injunction is an 'extraordinary and drastic remedy' . . . ; it is never awarded as of right . . . ." *Munaf v. Geren*, 553 U.S. 674, 689-90 (internal citations omitted). Generally, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *Id.*

Movants are entitled to a preliminary injunction if they can show a real probability of success on the merits. *Citizens for a Responsible Curriculum v. Montgomery Cty. Pub. Sch.*, Civil Action No. AW-05-1194, 2005 U.S. Dist. LEXIS 8130, at *20 (D. Md. May 5, 2005). When considering multiple first amendment claims, the court need not find each count to be successful, as one successful claim is individually sufficient to enjoin the defendant. *Id.* at 26-27.

Plaintiffs seek relief in their individual capacity and as potential class representatives. Plaintiffs' Complaint alleges seven counts: 1.) Declaratory Judgment; 2.) Violation of the First Amendment (Free Exercise of Religion); 3.) Violation of the First Amendment (Freedom of Association); 4.) Violation of the First Amendment (Freedom of Assembly); 5.) Violation of the Equal Protection Clause of the Fourteenth Amendment; 6.) 42 U.S.C. § 1983; and 7.) Violation of Article 36 of the Maryland Declaration of Rights (Religious Liberty).

Plaintiffs have a high likelihood of success on each of these claims.

a. **Declaratory Judgment.**

Plaintiffs have brought claims under the Maryland Uniform Declaratory Judgment Act, C&JP § 3-409, concerning the legal authority of the County Health Officer to issue his closure order, and the proper interpretation of the authority under the Governor's Executive Order. These claims are highly likely to succeed.

Besides the important constitutional issues presented here, Plaintiffs have plainly established the lack of authority under the Governor's executive order and State and county law to issue his closure order.  Federal courts, of course, have historically avoided constitutional questions if the matter can be solved on other grounds.  *Ashwander v. Tennessee Valley Authority*, 38. 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). Here, the court can resolve this injunction issue based on the County Health Officer's clear lack of authority under state and county law, before even considering the important constitutional issues here.

b. **First Amendment Violation – Free Exercise of Religion**

Under the Free Exercise Clause of the First Amendment, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. 1. The Clause is applicable to the States by incorporation into the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296 (1940). Courts evaluating whether state laws violate the free exercise clause of the First Amendment use a two-part "compelling interest" test. *Battles v. Anne Arundel Cty. Bd. of Educ*., 904 F. Supp. 471 (D. Md. 1995). To satisfy that test, first, the law must be a "valid and generally applicable law." *Id*. Second, the burden on religion must be incidental and not the purpose of the law. *Id*. If the law is not "generally applicable,"

then it is subject to strict scrutiny. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993).

The general applicability requirement protects religious observers against unequal treatment and inequality that results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursed only against conduct with religious motivation. *See Cent. Rabbinical Cong. of the United States v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). A law is therefore not generally applicable if it is substantially under inclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it. *Id.* Under this standard, the County's order is not generally applicable. In targeting only religious and private schools, while entirely ignoring public schools, the Court's decision is so under inclusive such that it is effectively regulating religious conduct. This unequal treatment is totally unjustified, as the religious schools being closed are often smaller and much better prepared to meet State and CDC pandemic guidelines. Therefore, the conduct being regulating is significantly less harmful that that the secular conduct that the County is failing to regulate. Based on that clear dichotomy, the County's rule is not generally applicable and must undergo the strictest level of scrutiny. Therefore, Plaintiffs have a high likelihood of success on the merits of their free exercise claim.

### c. First Amendment Violation – Freedom of Association

Under the First Amendment, the Supreme Court has recognized that the freedom of association receives protection as a fundamental element of personal liberty. *See Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). As such, the First Amendment protects an

individual's right to associate for the purposes of engaging in activities prescribed in the First Amendment – including the exercise of religion. *Id*.

Here, like the infringement on the free exercise of religion discussed *supra*, the County's decision impermissible infringes on the Plaintiffs' right to assemble in the exercise of their religion. The County's order is so under inclusive in targeting religious schools, while ignoring the much larger body of public secular schools, that its effect is to improperly regulate religious conduct. Consequently, Plaintiffs have a strong likelihood of succeeding on their claim.

**d. First Amendment Violation – Right of Assembly.**

Like the freedom of association discussed above, the Supreme Court has also recognized that the First and Fourteenth Amendment do not permit a State to improperly infringe on the right of assembly. *Coates v. Cincinnati*, 402 U.S. 611 (1971). Like the other First Amendment claims discussed *supra*, the County's order improperly infringes on the Plaintiffs' right to assemble and exercise their freedom of religion. By targeting religious and private schools and preventing students from receiving in person religious education, while simultaneously freely allowing public secular schools to do as they please, the County's order is improperly regulating religious conduct. Therefore, for the same reasons articulated above, the Plaintiffs have a strong likelihood of success on the merits of their First Amendment Claims.

**e. Fourteenth Amendment Violation – Equal Protection Clause**

The equal protection clause of the Fourteenth Amendment "requires that all persons subject to… legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed. *Engquist v. Or. Dep't of Agric*., 553 U.S. 591, 602 (2008). When those who appear similarly situated are nevertheless treated differently, the equal protection clause requires at least a rational reason for the difference, to ensure that all

persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." *Id*. Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised", and there must be a rational basis for the difference in treatment. *Id*.

Here, the County's order targeting students attending religious and private schools violates the equal protection clause. By prohibiting Plaintiffs from providing or receiving in-school instruction, while permitting their secular public school counterparts to make their own decisions as to how or when to open, Plaintiffs are being singled out by the County. There is no rational basis for this decision. Based on the frequently smaller size of the religious and private schools compared to public schools, and the significant steps that many have taken to prepare for reopening for in-person or hybrid in-person/virtual learning, many of these religious and private schools are prepared to safely reopen. Consequently, there is no rational basis to single out Plaintiffs and other private school students, and Plaintiffs have a strong likelihood of prevailing on their equal protection claims.

### f.  Violation of 42 U.S.C. § 1983

Under 42 U.S.C. § 1983, any person who institutes an ordinance that causes any citizen to be deprived of rights guaranteed by the constitution shall be liable in a civil action. As discussed above, the ordinance issued by the Health Officer, acting under the color of state law, violates numerous provisions of the First and Fourteenth Amendments, and for the same reasons articulated therein, Plaintiffs have a strong likelihood on the success of their 42 U.S.C. § 1983 claims.

### g.  Violation of Article 36 of the Maryland Declaration of Rights.

Under Article 36 of the Maryland Declaration of Rights, "all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or state... or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace, or safety of the state." Md. Dec. of R. art. 36. For the same reasons as the First Amendment violations articulated above, the County's order improperly deprives Plaintiffs of their right to exercise their religion. By targeting religious and private schools, the County's ordinance is preventing Plaintiffs and the putative class members from their right to in-person religious instruction. Further, based on the smaller size of the targeted schools, combined with the significant measures that the schools have taken to comply with state and CDC pandemic guidelines, the County's ordinance is in direct violation of Article 36 of the Maryland Declaration of Rights, and therefore Plaintiffs have a strong likelihood of success on the merits.

### 7. The County's action burdens religious schools and the families that choose to attend them.

The County Health Officer's directive specifically targets for closure "schools affiliated with religious institutions." Even the inclusion of nonreligious private schools is the definition of "nonpublic" is insufficient to survive a First Amendment challenge; "if the object of a law is to infringe upon or restrict" religious practices, "the law is not neutral" and is therefore "invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi Babalu Aye*, 508 U.S. at 533. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt." *Id.* at 534.

The County's action "burdens not only religious schools but also the families whose children attend or hope to attend them. Drawing on 'enduring American tradition,'" the Supreme

Court has "long recognized the rights of parents to direct 'the religious upbringing" of their children.' " *Espinoza v. Montana Dept. of Revenue*, 591 U.S.___, No. 18-1195, 23 (2020) (quoting *Wisconsin v. Yoder*, 406 U. S. 205, 213-214, 232 (1972)). "Many parents exercise that right by sending their children to religious schools, a choice protected by the Constitution." *Id.* (citing *Pierce v. Society of Sisters*, 268 U. S. 510, 534-535 (1925)). In short, the "'supreme law of the land' condemns discrimination against religious schools and the families whose children attend them." *Id.* at 25 (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)).

Moreover, the fact that no particular religion was targeted is irrelevant. First Amendment jurisprudence has "often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion **or of religion in general**." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added) (citing *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens*, 496 U. S. 226, 248 (1990) (plurality opinion); *School Dist. of Grand Rapids v. Ball*, 473 U. S. 373, 389 (1985); *Wallace v. Jaffree*, 472 U. S. 38, 56 (1985); *Epperson v. Arkansas*, 393 U. S. 97, 106-107 (1968*); School Dist. of Abington v. Schempp*, 374 U. S. 203, 225 (1963); *Everson v. Board of Ed. of Ewing*, 330 U. S. 1, 15-16 (1947)).

**8. The balance of equities and the public interest favor a temporary and preliminary injunction.**

"A party seeking a preliminary injunction must demonstrate both 'that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). "These factors merge when the Government is the opposing party." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020) ("Since the Government is a party to the suit, the balance of equities and the public

interest may be considered in tandem"); *Coreas v. Bounds*, Civ. No. TDC-20-0780, 2020 U.S. Dist. LEXIS 59211, at *48 (D. Md. Apr. 3, 2020).

As discussed above, a finding of success on the merits in this case would necessarily entail a finding that Defendants' actions violate Plaintiffs' First and Fourteenth Amendment rights. "Generally, 'upholding constitutional rights surely serves the public interest,'" and violations of such rights therefore tip the balance of equities toward the plaintiff. *Coreas*, 2020 U.S. Dist. LEXIS 59211, at *48 (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (holding that a violation of First Amendment rights justified a preliminary injunction).

It is not only the First Amendment violation, however, that tips the balance of equities and public interest toward Plaintiffs. A balance of equities may also be thought of as a "balance of hardships." *Winter*, 555 U.S. at 26. To defeat a preliminary injunction, the claimed harm to Defendants "must . . . outweigh the competing claim of injury" to Plaintiffs. *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 603 (4th Cir. 2017).

The harms to Plaintiffs here are significant. John and Kimberly Beahn chose to enroll their three children in Our Lady of Mercy because of their commitment to their Catholic faith; the order would prevent them from placing their children in a learning environment designed to instill religious values. Clara Obermeier chose to enroll her children at St. Bartholomew not only because it is associated with their Catholic parish and fosters their religious values but specifically because they cannot work from home and were impressed with St. Barthalomew's reopening plan. If their children are forced to stay home, the Obermeiers will face substantial difficulties in work and their children's education will suffer. Christopher and Meagan Rizzo likewise chose their son's school both "because of the character and spiritual development he

would receive there" and because her work as a physician and his work out of state would leave them reliant on a hired child care provider—assuming one can be found.

Miriam Roth, who believes it "essential" that her children attend a Jewish school, faces similar difficulties in working from home, as her fourth-grade son has Dyslexia and ADD and online instruction is unable to effectively replicate the special attention that her son was receiving at the Torah School of Greater Washington. Joshua and Penny Bortnick also place importance on sending their daughter, who has had difficulty making friends due to closed schools and distance learning, to a Jewish school.

Each of the schools, meanwhile, has invested thousands of dollars and significant time into ensuring that they can reopen in accordance with CDC guidelines. These efforts were undertaken in reliance on the expectation that they would be able to provide in-person learning during the school year, as are private schools in the rest of Maryland, the District of Columbia, Virginia, and throughout the nation, and in the expectation that they would be able to collect tuition at their usual rates. Defendants made no effort whatsoever to evaluate the significant measures the schools have taken to protect their students, to consider how the needs of the schools might differ from the needs of public schools, or to assist the schools with safely reopening, instead stating that CDC guidelines are "just…guidelines" and wholesale prohibiting the reopening of the schools for political reasons.

The harm to the individual Plaintiffs is reflective of the harm to the public interest. If Defendants' order is permitted to stand, 180 nonpublic schools will be forced to remain closed. 23,312 students will have to either go without in-person education, engage in some hastily-planned and less effective online education, or be taught at home by parents who may be busy, unavailable, or themselves unfamiliar with the subject matter, and the vast majority of whom

have no teaching experience. 5,650 nursery school-aged children will be unable to attend school, leaving their families to scramble—perhaps unsuccessfully—for new providers. Parents who work are either required to be at the office and are therefore unavailable to engage in child care and educational assistance, or work at home and therefore would be forced to juggle work and educational duties, detracting from the quality of both their own work and their child's education. And those families who make the choice to send their children to religious schools will be unable to provide their children with a learning environment that is designed to not only accommodate but enhance their faith.

These injuries are the result of an order issued at 8:00 PM on July 31, after the religious and private schools had already spent the summer taking significant steps to comply with CDC regulations in the expectation of opening in August or September. Defendants' delay in issuing the order has left little time for discussion, negotiation, or litigation on the merits before the school year is supposed to start. The short time frame renders the harm to Plaintiffs more significant. *See, e.g.*, *Benisek v. Lamone*, 266 F. Supp. 3d 799, 838 (D. Md. 2017) (where election was approaching, preliminary injunction was justified in part because of limited time).

The harm to Defendants, meanwhile, is minimal. While the County and its officials certainly have a legitimate interest in controlling the spread of COVID-19, there is nothing to suggest that private schools are a more significant source of infection than restaurants, bars, or gymnasiums, all of which are permitted to open. Moreover, there is nothing to suggest that daycare facilities associated with private or religious schools are a higher infection risk than daycare facilities not associated with private or religious schools, which are currently open. *Id.* at 6. Likewise, the County could not possibly make the case that private or religious schools are more prone to spreading infection than those in the Montgomery County Public School system,

which was given complete autonomy regarding reopening, or postsecondary schools, which are opening this month in the County. *Id.* at 6-7. There is thus "no evidence" that Defendants or the public "will be harmed by pressing pause" on the order. *J.O.P v. United States Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 380 (D. Md. 2019).

**9.  Conclusion.**

Plaintiffs, individually and behalf of those similarly situated, respectfully request that the Court issues temporary, preliminary, and permanent injunctive relief in their favor by enjoining Defendants from enforcing the Health Officer's August 31 directive and order

Respectfully submitted,

JOSEPH, GREENWALD, AND LAAKE, P.A.

 */s/ Timothy F. Maloney*
Timothy F. Maloney
Alyse L. Prawde
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Phone: (301) 220-2200
Fax: (240) 553-1761
tmaloney@jgllaw.com
aprawde@jgllaw.com